**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ILAN KHUTORSKY and RAPHAEL KHUTORSKY,<br><br>Plaintiffs,<br><br>- against -<br><br>MARTIN BORKAN; MSB HOSPITALITY, LLC; JOSEPH I. PARDO, ESQ.; PARDO LAW PLLC; and JOHN DOES 1–20,<br><br>Defendants. | Case No. ____________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br>(subject to Section 18 of the Settlement Agreement) |

Plaintiffs Ilan Khutorsky and Raphael Khutorsky, by their undersigned counsel, for their Complaint against Defendants Martin Borkan, MSB Hospitality, LLC, Joseph I. Pardo, Esq., Pardo Law PLLC, and John Does 1 through 20, allege as follows. Allegations concerning Plaintiffs and their own acts are made on personal knowledge; all other allegations are made on information and belief formed after reasonable inquiry.

## PRELIMINARY STATEMENT

1. This action arises from a settlement that Plaintiffs honored and the other side did not. On July 25, 2023, after a mediation in New York, Plaintiffs Ilan Khutorsky ("**Ilan**") and Raphael Khutorsky ("**Raphael**," and together with Ilan, "**Plaintiffs**") agreed to pay Defendant MSB Hospitality, LLC ("**MSB**") $450,000 to buy out the minority membership interests that MSB, an entity owned and controlled by Defendant Martin Borkan ("**Borkan**"), held in Plaintiffs' New York hospitality businesses, Something Good Supper Club, LLC ("**Something Good**") and Something Short LLC ("**Something Short**"), together with any interest MSB or Borkan claimed in any of their affiliates. In exchange, Borkan and MSB relinquished all ownership interests, released every claim through that date, covenanted never to sue on those claims again, agreed to retract the accusations they had made about Plaintiffs to a third party, agreed not to disparage

Plaintiffs, agreed to keep the terms confidential, and agreed to return Plaintiffs' files and relinquish access to Plaintiffs' systems. Plaintiffs paid every dollar, on time.

2. Borkan and MSB took the money and did not stop. Through their Florida counsel, Defendant Joseph I. Pardo, Esq. ("**Pardo**") and his firm, Defendant Pardo Law PLLC ("**Pardo Law**"), they commenced three new lawsuits against Plaintiffs within six weeks in the autumn of 2024, one of which sought the benefits of membership under the very operating agreement whose membership rights they had relinquished and released. In the autumn of 2025, as Plaintiffs were closing the sale of Something Short's assets (the "**Something Short Sale**"), Borkan telephoned the buyer, Carlos Hernandez ("**Hernandez**") (the "**Borkan Call**"), and told him that Plaintiffs were "fraudsters" and "con artists" who "steal money from people," that he could "get in trouble" for dealing with them, and that he should speak with Borkan's lawyer. In the same period, Borkan and MSB moved in Florida to attach the sale proceeds, served deposition subpoenas on approximately sixteen of Something Short's investors, and, through a person acting in concert with them, told those investors that Plaintiffs were stealing from the company and that the sale was a sham. The sale closed, but only after a delay that Plaintiffs had to fund.

3. The campaign was built on Plaintiffs' own confidential information. Upon information and belief, Borkan retained company files and system access that Section 22 of the settlement required him to return and disclaim, and Defendants obtained additional internal records—including investor information—from George P. Blesson ("**Blesson**"), a Something Short investor whom Pardo now represents, and, upon information and belief, from one or more other persons with access to those records. Those materials appeared in Defendants' court filings and drove Defendants' investor subpoenas.

4. The consequences were severe. Something Good, which had generated approximately $1,500,000 in annual revenue, ceased operations. Something Short, which generated more than $1,000,000 in revenue in 2024, had to be sold to avoid insolvency, and the closing of that sale was then delayed by Defendants' interference at a cost Plaintiffs had to carry, with the proceeds diverted to fund legal defense. Plaintiffs have incurred more than $700,000 in attorneys' fees defending the litigation that followed the settlement, including a proceeding the settlement forbade. Ilan, an attorney, and Raphael, a chef whose professional name and brand are his livelihood, have suffered the reputational injury that Defendants' accusations of theft and fraud were designed to inflict; Raphael's bookings, brand partnerships, and endorsements fell away for years.

5. Plaintiffs bring claims for breach of the settlement agreement and its covenant not to sue against Borkan and MSB; for misappropriation of trade secrets under the Defend Trade Secrets Act and state law; for tortious interference, abuse of process, defamation, and civil conspiracy against the Defendants who carried out the campaign; and for declaratory relief concerning the scope of the releases and the Borkan Defendants' continuing obligations.

## THE PARTIES

### A. Plaintiffs

6. Plaintiff Ilan Khutorsky is a natural person domiciled in and a citizen of the State of New York. Ilan is an attorney admitted to practice in New York and was, at all relevant times, a founder and managing member of Something Good and its affiliated entities.

7. Plaintiff Raphael Khutorsky, known professionally as "Chef Raph," is a natural person domiciled in and a citizen of the State of New York. Raphael is a chef and hospitality

entrepreneur and was, at all relevant times, a founder and managing member of Something Good and its affiliated entities.

8. Non-parties Something Good Supper Club, LLC, Something Short LLC, and Something Good Events LLC are Delaware limited liability companies, and non-party Sando Supplies, LLC ("**Sando**") is a New York limited liability company (collectively, the "**Companies**"). Plaintiffs founded, owned, and managed each of the Companies. Something Good operated a supper club in Manhattan. Something Short owned and operated a hospitality venue at 355 Bowery, New York, New York. Something Good, Ilan, Raphael, and Sando were the defendants in the Florida Action described below and are, together, the "Defendants" as that term is used in the Settlement Agreement. The Companies and their related entities are referred to collectively as the "**Something Good Affiliates**."

9. In connection with the winding up of their affairs, the Companies executed a written assignment (the "**Assignment**") transferring to Plaintiffs all of their right, title, and interest in the claims asserted herein and in the confidential information and trade secrets at issue, to the extent not transferred to the purchaser in the sale of Something Short. Section 14 of the Settlement Agreement provides that the Agreement inures to the benefit of the Parties' "affiliates, . . . successors and assigns." Plaintiffs sue individually for their own direct injuries and as assignees of the Companies. No claim is asserted derivatively.

**B. The Borkan Defendants**

10. Defendant Martin Borkan is a natural person who, upon information and belief, is domiciled in and a citizen of the State of Florida, residing at 1600 NE 1st Avenue, Apt. 2818, Miami, Florida 33132. Upon information and belief, Borkan is the sole owner, directly or through the Martin Borkan Declaration of Trust described below, and the sole principal of MSB, and at all

relevant times directed and controlled its conduct. Borkan signed the Settlement Agreement individually and on behalf of MSB.

11. Defendant MSB Hospitality, LLC is a Florida limited liability company (Florida Document No. L22000403605) with its principal place of business at 488 NE 18th Street, #3109, Miami, Florida 33132. MSB's 2026 Florida Annual Report, filed February 4, 2026 and electronically signed by Pardo as MSB's agent, identifies Pardo Law as MSB's registered agent and identifies the Martin Borkan Declaration of Trust, a Florida trust of which, upon information and belief, Borkan is the trustee, as MSB's manager and authorized member. Upon information and belief, MSB's members consist of the Martin Borkan Declaration of Trust and, to the extent he holds any interest directly, Borkan; the trust is a traditional trust of which Borkan, a citizen of Florida, is the trustee; and no member of MSB, and no trustee or beneficiary of the trust, is a citizen of the State of New York. Borkan and MSB are referred to together as the "**Borkan Defendants**."

**C. The Attorney Defendants**

12. Defendant Joseph I. Pardo, Esq. is an attorney admitted to practice in Florida and, upon information and belief, a citizen of the State of Florida. Pardo represented MSB in the Florida Action, appearing on the docket in his individual capacity from a Miami Beach address; was designated in Section 10 of the Settlement Agreement, under the name of Pardo Jackson Gainsburg, PL, as the recipient of copies of all notices to MSB; and, since in or about late 2023, has represented the Borkan Defendants through Pardo Law, a professional limited liability company he organized in 2023. Pardo has appeared pro hac vice in the Supreme Court of the State of New York, New York County, in the Blesson Action described below.

13. Defendant Pardo Law PLLC is a Florida professional limited liability company with its principal place of business at 1205 Lincoln Road, Suite 211, Miami Beach, Florida 33139,

the address at which it serves as MSB's registered agent. Upon information and belief, no member of Pardo Law is a citizen of the State of New York. Pardo Law acted at all relevant times through Pardo and others subject to its direction and control. Pardo and Pardo Law are referred to together as the "**Attorney Defendants**."

**D. The Doe Defendants**

14. Defendants John Does 1 through 20 (the "**Doe Defendants**") are persons or entities, presently unknown to Plaintiffs, who participated in, funded, directed, or substantially assisted the conduct alleged herein. Upon information and belief, no Doe Defendant is a citizen of the State of New York. Plaintiffs will amend to name the Doe Defendants when their identities are ascertained.

15. The named Defendants and the Doe Defendants are referred to collectively as "**Defendants**." Where this Complaint attributes conduct to "Defendants" collectively, Plaintiffs allege that each Defendant participated in, authorized, directed, or substantially assisted that conduct as further specified herein.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Count III arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) because they arise from the same nucleus of operative facts—the Settlement Agreement, Defendants' breach of it, and the litigation and interference campaign built upon the misappropriated information—and form part of the same case or controversy.

17. In the alternative, this Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs are citizens of New York. Upon information and belief, Borkan and Pardo are citizens of Florida, and MSB and Pardo Law are limited liability companies none of whose

members is a citizen of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs: Plaintiffs seek, among other relief, recovery of more than $700,000 in attorneys' fees incurred in defending proceedings barred by the Settlement Agreement, damages for the destruction of Something Good and the forced sale and delayed closing of Something Short, and reputational damages.

18. This Court has personal jurisdiction over each Defendant under N.Y. C.P.L.R. 302(a) and consistent with due process, as follows:

(a) Borkan and MSB transacted business in New York through MSB's investment in Something Good and Something Short, businesses operating in Manhattan, and Borkan's involvement in the day-to-day operations of Something Good; by attending the July 25, 2023 mediation in New York and executing there a Settlement Agreement whose performance obligations—the relinquishment of interests in New York businesses, the release of Borkan from guarantees to the New York State Liquor Authority, and the return of New York companies' property and system access—centered on New York; and by thereafter commencing, prosecuting, and directing the New York proceedings described below. Plaintiffs' contract claims arise directly from that New York transaction. C.P.L.R. 302(a)(1).

(b) Pardo and Pardo Law transacted business and committed tortious acts in New York by appearing pro hac vice and prosecuting the Blesson Action in the Supreme Court, New York County; by issuing, under New York Civil Practice Law and Rules § 3119 and through New York co-counsel, deposition subpoenas to investors in a New York business at their New York addresses, and transmitting to each of them Ilan's confidential September 9, 2025 investor communication; and, upon

information and belief, by procuring and coordinating, with Blesson in New York, the October and November 2025 statements to Something Short's investors described in Part I below. C.P.L.R. 302(a)(1), (a)(2).

(c) Borkan purposefully directed tortious conduct into New York by placing the Borkan Call, on October 8, 2025, to Hernandez, the New York-based purchaser of a New York business, and making the statements described in Part J. Upon information and belief, Blesson, a resident of New York, made the statements to investors described in Part I at the request of, for the benefit of, and in coordination with Borkan and Pardo, each of whom knew that those statements would be made in New York and have their effect there, so that Blesson's acts in New York are attributable to Borkan, MSB, Pardo, and Pardo Law for jurisdictional purposes. Each Defendant also committed tortious acts outside New York causing injury to persons and property within New York—the destruction of Something Good, the disruption of the Something Short Sale, and injury to Plaintiffs' New York-based reputations and relationships—and each expected or should reasonably have expected those acts to have consequences in New York, where the targets of the campaign resided and operated. The Borkan Defendants derived substantial revenue from interstate commerce through their investment in a New York business, and the Attorney Defendants derive substantial revenue from the interstate practice of law, including in New York. C.P.L.R. 302(a)(3).

(d) Each Defendant purposefully directed the conduct alleged herein at New York residents and New York businesses, such that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here: the Settlement Agreement was negotiated and executed at a mediation in New York; the businesses whose sale, investors, and licenses Defendants attacked operated at 355 Bowery in Manhattan; the communications to the purchasers of Something Short's assets and to its investors were directed into this District; and the Blesson Action and the other New York proceedings through which Defendants pursued the campaign were commenced and prosecuted here.

20. Section 18 of the Settlement Agreement provides that the Agreement "is enforceable in the state or federal courts of Florida." That clause is permissive: it confers jurisdiction on the Florida courts but does not make Florida the exclusive forum, contains no language of exclusivity, and does not bar suit elsewhere.

21. Section 18 further provides that the Settlement Agreement "shall be construed and governed exclusively by the laws of the Florida, without giving effect to its conflict of laws provisions." Plaintiffs' claims for breach of the Settlement Agreement (Counts I and II) and for declaratory relief concerning it (Count IX) are accordingly pleaded under Florida law. Plaintiffs' tort and statutory claims (Counts III through VIII) are governed by federal law and by the law of New York, where the injury was suffered and where the tortious conduct was directed; to the extent the Court determines that Florida law governs any of those claims, Plaintiffs plead them in the alternative under Florida law, and the allegations herein satisfy the elements of each claim under either State's law.

## FACTUAL ALLEGATIONS

### A. Plaintiffs and the Something Good Affiliates

22. Plaintiffs devoted years of labor, capital, and personal credit to building the Something Good Affiliates, a family of New York hospitality businesses. Something Good generated approximately $1,500,000 in annual revenue in a good year. Something Short, operating at 355 Bowery in Manhattan, generated more than $1,000,000 in revenue in 2024, and its performance was improving year over year.

23. Raphael's professional identity is a commercial asset in its own right. As "Chef Raph," Raphael authored a cookbook for a major brand, for which he was paid substantial compensation; maintained recurring brand partnerships and endorsement arrangements that generated substantial revenue; was regularly booked for live events and appearances; and operates social-media channels, including an Instagram account with approximately 70,000 followers, that have drawn tens of millions of views. That following drove business and press to the Something Good Affiliates. Raphael's bookings, partnerships, and endorsements depend on his reputation for honesty and on the willingness of brands and event promoters to be associated with him.

### B. Borkan's Investment and the Dispute

24. Before the Florida Action was commenced, Borkan, through MSB, invested in Something Good and in Something Short in exchange for minority, non-managing membership interests in each, held under Something Good's August 1, 2022 Operating Agreement (the "**Operating Agreement**") and Something Short's operating agreement, respectively. MSB alone held those interests; Borkan was never individually a member of either company.

25. Following the investment, Borkan involved himself in the day-to-day operations of Something Good. Disagreements over management and operations escalated into a dispute.

Among Borkan's contentions was that he was entitled to twenty-five percent (25%) of Raphael's likeness. No agreement of any of the Companies granted Borkan or MSB any interest in Raphael's name, likeness, or brand.

26. On or about May 1, 2023, MSB and Borkan, through Pardo, sent a letter containing accusations against Plaintiffs to Pardalis & Nohavicka LLP ("**P&N**"), a law firm that had previously represented Something Good and with which Ilan had been associated (the "**P&N Letter**").

27. On May 21, 2023, MSB, represented by Pardo, commenced a verified action against Something Good, Ilan, Raphael, and Sando in the United States District Court for the Southern District of Florida, captioned MSB Hospitality, LLC v. Something Good Supper Club, LLC, et al., No. 1:23-cv-21888 (S.D. Fla.) (the "**Florida Action**"). Plaintiffs moved to dismiss the Florida Action for lack of personal jurisdiction and for failure to state a claim.

**C. The Settlement Agreement**

28. On July 25, 2023, the parties to the Florida Action and Borkan attended an in-person mediation in New York before Judge Carpinello (Ret.) and executed a Mediated Settlement Agreement (the "**Settlement Agreement**" or "**Agreement**"), effective as of that date (the "**Effective Date**"). The parties to the Agreement are MSB (defined therein as "Plaintiff"), Borkan, and Something Good, Raphael, Ilan, and Sando (defined therein collectively as "Defendants"). Each of MSB, Borkan, and the Defendants is a "Party" under the Agreement. Borkan signed individually and as MSB's authorized representative. Quotations from the Agreement below use the Agreement's own defined terms, under which "Plaintiff" means MSB and "Defendants" means Something Good, Ilan, Raphael, and Sando.

29. The Agreement recites that the Parties "agreed to resolve the Dispute, Action, and all disagreements between them, consistent with the terms herein."

30. Section 2 (Payment) provides that "Defendants agree to pay Plaintiff the amount of $450,000, to buy it out of MSB's membership interest in Something Good, including any and all ownership interest that MSB or Borkan may have in any affiliated entities of Something Good, including but not limited to Something Short LLC and Something Good Events LLC (the 'Buyout')," payable as follows: "$100,000 paid within 60-days of the Effective Date; plus $100,000 paid within 90-days of the Effective Date; plus $250,000 paid within 15-months of the Effective Date" (the "**Buy Out Payments**"). Section 2 further provides that "Defendants shall be allowed to use any lawful source for payment of the Buyout, including funds that are provided by third parties, through loans, or otherwise."

31. Section 3 (Ownership) provides that "MSB and Borkan hereby give up and forever relinquish any ownership interest that they may have or claim in Something Good and any of Something Good's affiliated entities, including but not limited to Something Short LLC and Something Good Events LLC."

32. Section 5 (Retraction Letter) required MSB and Borkan, within three days of the Effective Date, to send a joint letter to P&N retracting the May 1, 2023 letter and "advising that any and all disputes between Plaintiff, Borkan, Ilan, Raphael, Something Good, and Sando have now been resolved."

33. Section 8 (Plaintiff and Borkan's Release) provides that MSB and Borkan, "on behalf of themselves and on behalf of their directors, members, owners, investors, managers, officers, shareholders, employees, subcontractors, attorneys, successors and assigns, and insurers (collectively 'Borkan Releasors')," release and forever discharge "Defendants, Leonid Khutorksy,

Nelly Khutorsky, Something Short LLC and Something Good Events LLC, and their directors, officers, shareholders, members, owners, employees, subcontractors, attorneys, successors and assigns, and insurers (collectively 'Releasees')," from "all causes of action, suits, debts, sums of money, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity . . . from the beginning of the world to the Effective Date, including, without limitation, any claims asserted or that could have been asserted in the Dispute or Action (collectively 'Released Claims')." Section 8 preserves only one category of suit for MSB: "Plaintiff may bring an action to enforce this Agreement, including the entry of the consent judgment should there be a breach, and/or for damages for breach of this Agreement as provided herein."

34. Section 8.a (Plaintiff's Covenant Not to Sue) provides: "Borkan Releasors covenant not to sue and/or initiate any legal action against the Releasees for any of the Released Claims."

35. Section 9 and Section 9.a contain the mirror-image release and covenant not to sue running from Plaintiffs and the Companies, as "Khutorsky Releasors," in favor of MSB and Borkan, and preserve for Plaintiffs the right to "bring an action to enforce this Agreement and/or for damages for breach of this Agreement as provided herein."

36. Section 10 (Notices) requires that copies of all notices to MSB be sent to "Pardo Jackson Gainsburg, PL, Attn: Joseph Pardo, Esq."

37. Section 11 (Non-Disparagement) provides: "The Parties, and all of their employees, contractors, or agents, agree to not make any statements, oral or written, which are intended, directly or indirectly, to disparage and/or defame the other Party, and if any non-party asks about this Dispute or Action, the Parties are to simply say that 'it was resolved amicably' and /or that 'Martin Borkan through his entity was bought out.'"

38. Section 12 (Confidentiality) provides that "the terms, provisions and conditions of this Agreement shall forever be kept confidential by each Party and shall not, in any manner or for any reason, be disclosed by any Party," subject to three exceptions: disclosure "required by government agencies," disclosure "pursuant to court order compelling such disclosure," and disclosure "in the event a Party is forced to file a motion seeking to enforce any term or condition of this Agreement." Section 12 repeats the scripted response: "Should any Party receive any inquiries regarding or relating to the Dispute or Action, it shall simply say that 'it was resolved amicably' and /or that 'Martin Borkan through his entity was bought out.'"

39. Section 13 (Further Assurances) provides that "[e]ach Party shall act in good faith and use its best efforts to expeditiously comply with all of the terms and conditions herein."

40. Section 14 (Successors and Assigns) provides that the Agreement "shall be binding upon the Parties hereto and upon their . . . affiliates, . . . successors and assigns, and shall inure to the benefit of said Parties and each of them and to their . . . affiliates, . . . successors and assigns."

41. Section 18 (Governing Law and Interpretation; Jury Waiver) provides that the Agreement is governed by Florida law, that it "is enforceable in the state or federal courts of Florida," that upon any breach "the Parties affirm that they may institute an action to specifically enforce any term or terms of this Agreement for damages as provided herein or both," and that "[t]he Parties waive any right to trial by jury, which either may have in any action to interpret, apply or enforce this Agreement, or in which this Agreement is asserted as a defense."

42. Section 19 (Attorney's Fees) provides that "[i]n the event of any dispute, controversy or claim arising in connection with this Agreement, including any dispute to enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs," including fees incurred in litigating entitlement to and the amount of

fees, "whether incurred before suit, during suit, at the appellate level and/or in connection with any related bankruptcy proceeding," together with enumerated non-taxable costs.

43. Section 20 (Dismissal) required MSB, within three days of the Effective Date, to "file a notice of dismissal of the Action with prejudice with each Party bearing their own costs and attorney's fees, and with the Court retaining jurisdiction to enforce the terms of this Agreement."

44. Section 21 (Consent Judgment) provides that if Defendants fail to timely make the Buy Out Payments and fail to cure within fifteen days of a Notice of Default, MSB may obtain a Consent Final Judgment "against Ilan and Raphael, jointly and severally, for $825,000 less any monies received." Section 21 further provides that "MSB shall not argue that it is a fraudulent conveyance or a breach of this Agreement for Defendants to liquidate their assets upon a default to help satisfy the consent judgment."

45. Section 22 (Return of Property) required MSB and Borkan, within seven days of the Effective Date, to "return to Defendants all property, files, and other Defendants materials in their possession (including any computers, laptops, cell phones, PDAs, credit cards, keys, badges, parking pass, jump drive/USB, etc.), and all copies of computerized databases and related materials, including any and all materials currently in their possession, custody or control," and to "provide Defendants with all passwords and logins required or necessary to access Defendants files, documents or information, and to transfer and/or remove themselves from same (including but not limited to Quickbooks, Paychex, Toast, Google Workspace)." Section 22 further provides that Defendants "will endeavor to advise MSB and Borkan of all property, logins, passwords, and other information they need MSB and Borkan to return and MSB and Borkan, in turn, will forever disclaim such access."

**D. Plaintiffs Performed**

46. Plaintiffs paid the full $450,000 Buyout in three payments, each in full and on time within the period Section 2 prescribed, and the Borkan Defendants accepted and have retained every dollar. MSB never served a Notice of Default under Section 21, and the consent-judgment mechanism was never invoked. In the Miami-Dade Borkan Action (defined in Part G below), a judgment entered on default and without an evidentiary hearing recites that the Buy Out Payments were made from an unlawful source. Plaintiffs dispute that recital and have appealed; they do not ask this Court to review it, and no claim asserted herein depends on its resolution.

47. Plaintiffs performed their other obligations under the Settlement Agreement. As set forth in Part G below, the Borkan Defendants have since obtained in Florida, by default and without an evidentiary hearing, a judgment reciting that Plaintiffs breached the Agreement. Plaintiffs dispute that judgment, which is on appeal, and do not seek its review in this action.

48. On July 28, 2023, MSB filed a Notice of Settlement in the Florida Action. On July 31, 2023, MSB filed a Notice of Voluntary Dismissal, and the Court entered an order closing the Florida Action.

49. All conditions precedent to Plaintiffs' claims have been performed, have occurred, or have been waived.

**E. The Borkan Defendants Did Not Perform**

50. Upon information and belief, MSB and Borkan did not return all of the Companies' files and "all copies of computerized databases and related materials" as Section 22 required, and did not relinquish their access to the Companies' systems. Upon information and belief, Borkan retained copies of the Companies' investor information, financial records, and internal communications after the Effective Date. The basis for this belief is set out in Parts G and H below:

materials of this kind, which MSB and Borkan held by virtue of MSB's former membership interests, were later used in Defendants' court filings and subpoenas.

51. Upon information and belief, MSB and Borkan also never sent the joint retraction letter to P&N that Section 5 required within three days of the Effective Date, and the P&N Letter's accusations against Plaintiffs have never been withdrawn.

**F. Borkan's Stated Intent**

52. Borkan did not regard the Settlement Agreement as the end of the dispute. Before the mediation, Borkan told Ilan on more than one occasion that, because of his wealth, he could get around rules and "make things happen."

53. In or about April 2023, approximately one month to six weeks before MSB commenced the Florida Action, Henry Goldman ("**Goldman**"), then Chief Financial Officer of the Something Good Affiliates, told Ilan that Plaintiffs would be "buried" and conveyed to Ilan an ultimatum that Goldman stated he had received from Borkan: Ilan must abandon the Something Good Affiliates and align himself with Borkan, or Plaintiffs would face a sustained "siege" of litigation and economic pressure. Goldman left the Something Good Affiliates the same day. On May 21, 2023, MSB filed the Florida Action. Goldman is not named as a defendant; his statements are alleged as evidence of Borkan's intent and of the timing of Borkan's plan.

54. Upon information and belief, Borkan and MSB executed the Settlement Agreement intending to take the Buy Out Payments and the benefit of Plaintiffs' releases while continuing to pursue Plaintiffs by other means. That intent is inferred from the ultimatum described above, from Borkan's statements to Ilan, and from the Borkan Defendants' conduct after the Effective Date, as described below. Borkan's undisclosed intent does not impair the Agreement's validity; Plaintiffs allege it as evidence that the breaches that followed were willful.

### G. The Post-Settlement Litigation Campaign

55. The Settlement Agreement did not end the litigation. Within six weeks in the autumn of 2024, the Borkan Defendants, through Pardo and Pardo Law, commenced three new actions against Plaintiffs and the other Releasees. Borkan is a named plaintiff in his individual capacity in each of them.

56. On September 11, 2024, Borkan and MSB commenced *Martin Borkan, et al. v. Ilan Khutorsky, et al.*, No. 2024-017382-CA-01 (Fla. 11th Jud. Cir. Ct., Miami-Dade County), against Ilan, Raphael, and Something Good (the "**Indemnification Action**"). The Indemnification Action sought a declaration that Something Good was obligated to indemnify MSB and Borkan, and to advance their defense costs, under Article X of the Operating Agreement—the agreement under which MSB had held the membership interest it relinquished in Section 3 of the Settlement Agreement—in connection with proceedings arising from events during MSB's membership, and asserted a claim against Ilan and Raphael for breach of fiduciary duty as Managers of Something Good. The complaint in the Indemnification Action did not mention the Settlement Agreement. On March 13, 2025, following a hearing on Plaintiffs' motion to dismiss, the court entered an Order of Dismissal.

57. The claims asserted in the Indemnification Action were Released Claims: claims that the Borkan Releasors "hereafter can, shall or may have against the Releasees . . . by reason of" MSB's membership in Something Good and the Operating Agreement that governed it—matters arising before the Effective Date—and claims to the benefits of a membership interest that MSB and Borkan agreed in Section 3 to "give up and forever relinquish." The Indemnification Action was not an action "to enforce this Agreement" within the meaning of Section 8. Its

commencement and prosecution breached Section 8.a. The Indemnification Action is referred to herein as the "**Prohibited Proceeding**."

58. On October 7, 2024 and October 21, 2024, Borkan and MSB commenced two further actions: *Martin Borkan, et al. v. Something Good Supper Club, LLC, et al.*, No. 2024-019231-CA-01 (Fla. 11th Jud. Cir. Ct., Miami-Dade County) (the "**Miami-Dade Borkan Action**"), and *Martin Borkan, et al. v. Something Good Supper Club LLC, et al.*, No. 1:24-cv-24068 (S.D. Fla.) (together with the Miami-Dade Borkan Action, the "**Enforcement Actions**"). The Enforcement Actions purport to enforce the Settlement Agreement, principally on the theory that the Buy Out Payments were made from an unlawful source. Default judgments were entered against Plaintiffs in the Enforcement Actions on November 21, 2025 and October 7, 2026, respectively; the Miami-Dade judgment is on appeal. Plaintiffs do not plead the commencement of the Enforcement Actions as a breach of Section 8.a, and do not seek in this action review or modification of any judgment entered in them.

59. In addition, on or about October 14, 2024, Blesson commenced an action against Plaintiffs and the Something Good Affiliates captioned *George Blesson v. Something Good Supper Club, LLC, et al.*, Index No. 655429/2024 (Sup. Ct. N.Y. County) (the "**Blesson Action**"). Pardo appeared *pro hac vice* as Blesson's counsel in the Blesson Action. Upon information and belief, the Blesson Action was commenced at the instance of and in coordination with the Borkan Defendants. The basis for this belief is that Borkan had previously solicited Blesson's assistance against Plaintiffs, as alleged in Part H; that Blesson is represented in his own action by the same attorney who represents the Borkan Defendants against Plaintiffs; and that the Companies' confidential materials to which Blesson had access have appeared in the Borkan Defendants' own filings.

60. Plaintiffs, together with another member of Something Short, have commenced an action against Blesson in the Supreme Court of the State of New York, Suffolk County, Index No. 603751/2026 (the "**Suffolk Action**"), addressing Blesson's own liability. Blesson is not named as a defendant here.

61. In the Miami-Dade Borkan Action, by notices dated and filed October 6, 2025, two days before the Borkan Call described in Part J below, and served beginning on or about October 24, 2025, the Borkan Defendants, through Pardo and Pardo Law, caused deposition notices and subpoenas duces tecum to be directed to approximately sixteen investors in Something Short (the "**Investor Subpoenas**"). Upon information and belief, the recipients could not have been identified from any public source and were identified from the Companies' confidential investor records, including the capitalization table that Borkan and MSB admitted possessing in their October 21, 2024 complaint; the number of recipients corresponds to the number of Something Short investors identified in that complaint.

62. The Investor Subpoenas were issued under New York Civil Practice Law and Rules § 3119 and Florida Rule of Civil Procedure 1.310(b)(1), with a New York-admitted attorney appearing as co-counsel to the Borkan Defendants for that purpose, and were directed to recipients at New York addresses, including an investor at an address on Rivington Street in Manhattan. They were transmitted by email from Pardo Law's Miami Beach office with a cover message stating that the recipient had "been identified as an individual with personal knowledge of certain facts related to this case," scheduling a remote deposition for November 3, 2025, and demanding production of documents by email within days. Each demanded, among other things, the recipient's notes of meetings with Something Short representatives or other investors; the recipient's communications with other investors, potential investors, or third parties concerning

Something Short's "business, financial health, or management"; all documents concerning the Asset Purchase Agreement; and a copy of the Asset Purchase Agreement itself. Each attached, as its Exhibit 1, Ilan's confidential September 9, 2025 communication to Something Short's investors, thereby disseminating that communication to every recipient.

63. On November 2, 2025, twelve days before the Borkan Defendants moved for the default judgment that ended the Miami-Dade Borkan Action on the merits, Pardo Law wrote to at least one subpoenaed investor that it had postponed his deposition and asked that he contact the firm to reschedule it "for a mutually agreeable date and time in December 2025."

64. In the Enforcement Actions, the Borkan Defendants asserted that the funds Plaintiffs used to make the Buy Out Payments were unlawfully obtained. Plaintiffs deny those assertions. Section 2 of the Agreement expressly permitted payment from "any lawful source . . . including funds that are provided by third parties, through loans, or otherwise."

**H. Blesson and the Misappropriated Information**

65. Blesson was an investor in Something Short who, by virtue of that investment and his dealings with the Companies, had access to the Companies' confidential information, including investor identities, contact information, commitments, and communications; non-public financial statements and records; internal communications; and information concerning prospective transactions, including the Something Short sale. Blesson was bound to maintain the confidentiality of that information by the terms of his investment and by the circumstances under which it was entrusted to him.

66. The Companies maintained that information in confidence. Access was limited to members and personnel with a need to know; the information was stored in password-protected systems, including QuickBooks, Paychex, Toast, and Google Workspace; and persons with access

were bound to maintain its confidentiality. The Settlement Agreement itself reflects the confidential and proprietary character of the information: Section 22 identifies these systems by name, designates their contents as "Defendants materials," and required MSB and Borkan to return all copies and disclaim all access.

67. Upon information and belief, after the Effective Date Borkan approached Blesson and solicited his assistance against Plaintiffs. Blesson initially declined and, at that time, told Ilan that Borkan had made the approach and that Blesson had refused.

68. Blesson later reversed course. Upon information and belief, Blesson thereafter furnished the Companies' confidential information to Borkan and to Pardo, including investor information, internal communications, and financial records. The basis for this belief is that materials filed by the Borkan Defendants in the Enforcement Actions consist of confidential Company documents post-dating the Effective Date to which Blesson had access, and that the Investor Subpoenas described above targeted investors whose identities were known only from the Companies' confidential records. Upon information and belief, one or more other persons with access to the Companies' confidential information, whose identities are presently unknown to Plaintiffs, also furnished such information to Borkan and Pardo; Blesson was, in any event, among the sources.

69. The Borkan Defendants have acknowledged possessing the Companies' post-settlement internal records. In the complaint they filed on October 21, 2024, Borkan and MSB alleged that on March 26, 2024—eight months after the Effective Date—Something Good and Something Short "amended their operating agreements," that "[t]he Capital Table enclosed thereto revealed hundreds of thousands of dollars of capital injections from third party investors," and they identified sixteen investors in Something Short by name and by the amount of each investment.

MSB and Borkan held no interest in either company on March 26, 2024, were not entitled to receive their amended operating agreements or capitalization tables, and had covenanted in Section 22 to return all Company materials and to "forever disclaim" access to them.

**I. Disparagement of Plaintiffs**

70. After the Effective Date, Defendants, directly and through a person acting in concert with them, made the following statements about Plaintiffs to third parties, each outside of any court filing or judicial proceeding:

(a) On October 8, 2025, in the Borkan Call described in Part J below, Borkan told Hernandez, the purchaser of Something Short's assets in the Something Short Sale, that Ilan and Raphael were "fraudsters" and "con artists" who "steal money from people," that Hernandez could "get in trouble" for accepting what he was receiving from them, and that Hernandez should speak with Borkan's attorney.

(b) In or about October and November 2025, Blesson, acting in concert with and, upon information and belief, at the request of and on behalf of Borkan and Pardo, told investors in Something Short, orally and in written messages, that Plaintiffs were stealing Something Short's funds and intended to defraud its investors in connection with the Something Short Sale; that the Something Short Sale was a "fraudulent conveyance" designed to place Something Short's assets beyond the reach of its investors; and that a former associate of Something Short was secretly among the purchasers, so that the Something Short Sale was a sham or self-dealing transaction. The former associate so identified was not, and has never been, among the purchasers. The basis for the belief that Blesson acted at the request of and on behalf of Borkan and Pardo is that Pardo was then representing Blesson, pro hac

vice, in the Blesson Action; that Blesson's statements to investors tracked the theory of the Attachment Motion, described in Part J below, that Pardo had filed for the Borkan Defendants weeks earlier; that Blesson had, by his own earlier account to Ilan, been solicited by Borkan to assist against Plaintiffs; and that the statements were made in the same weeks in which the Borkan Defendants, through Pardo, served the Investor Subpoenas on the same investors; and that they repeated, in substance, what Borkan himself had said to the buyer in the Borkan Call.

The statements in subparagraphs (a) and (b) are referred to as the "**Disparaging Statements**." Each was false. Each was made by a Party to the Agreement or by a person acting as that Party's agent and in concert with it, and each was the opposite of the response Sections 11 and 12 permit.

71. The Disparaging Statements and the Investor Subpoenas had their intended effect. Investors in Something Short called, texted, and emailed Ilan to ask whether the Something Short Sale was a fraudulent conveyance, whether a former associate was secretly among the purchasers, and whether Plaintiffs were stealing from the company. Plaintiffs were required to devote substantial time to responding to those inquiries and to incur legal fees in connection with the Investor Subpoenas.

**J. The Autumn 2025 Interference with the Something Short Sale**

72. By mid-2025, the cumulative cost of defending the Prohibited Proceeding, the Enforcement Actions, and the Blesson Action—more than $700,000 in attorneys' fees and expenses—had driven Something Short to the brink of insolvency. Plaintiffs determined to sell Something Short in order to avoid bankruptcy and return as much capital as possible to its investors.

73. By the autumn of 2025, Plaintiffs were negotiating the sale of Something Short's assets to a purchasing group led by Hernandez (together with the entity through which they purchased, the "**Prospective Purchasers**"). Hernandez was introduced to Plaintiffs through a business broker in connection with the sale and had no prior relationship with either of them. By September 9, 2025, Plaintiffs and the Prospective Purchasers had executed an Asset Purchase Agreement for the Something Short Sale and were proceeding toward a closing expected in the autumn of 2025.

74. On October 8, 2025, Borkan placed the Borkan Call to Hernandez. Borkan had no business relationship with Hernandez and no reason to call him other than Hernandez's pending purchase of Something Short's assets under the Asset Purchase Agreement; upon information and belief, Borkan learned of Hernandez's identity and role as purchaser, and obtained his telephone number, from the Companies' confidential information described in Part H. Borkan told Hernandez to be careful about working with Ilan and Raphael; that they were "fraudsters" and "con artists" who "steal money from people"; that Hernandez could "get in trouble" for accepting what he was receiving from them; and that Hernandez should speak with Borkan and Borkan's attorney. Hernandez refused, told Borkan that he worked with Ilan and Raphael on this transaction and trusted them, and told Borkan not to call him again.

75. Borkan did not name the attorney. Upon information and belief, the attorney was Pardo. The basis for this belief is that Pardo was then counsel to the Borkan Defendants in every pending proceeding against Plaintiffs and had, in the same period, undertaken the representation of Blesson, another Something Short investor, in an action against Plaintiffs, as alleged in Part G.

76. On September 18, 2025, Borkan and MSB, through Pardo and Pardo Law, filed in the Miami-Dade Borkan Action a motion for a pre-judgment writ of attachment seeking to seize

$100,000 of the proceeds of the Something Short Sale or, in the alternative, to enjoin the sale (the "**Attachment Motion**"). The Attachment Motion quoted in full an internal September 9, 2025 communication from Ilan to Something Short's investors reporting that the Asset Purchase Agreement had been executed and describing the amount, timing, and intended distribution of the first tranche of sale proceeds. That communication was confidential, was sent only to Something Short's investors, and was in the Borkan Defendants' hands within nine days. Upon information and belief, it was furnished to them by Blesson, an investor in Something Short who received it, or by one or more other recipients acting in concert with him. The Attachment Motion was never set for hearing and no writ issued.

77. The Something Short Sale ultimately closed, but not until months after the closing the parties had expected in the autumn of 2025; the Borkan Call, the Attachment Motion, the Investor Subpoenas, and the Disparaging Statements delayed it. The proceeds of the sale, rather than being distributed to Something Short's members under its operating agreement, were required to be placed in counsel's escrow account to fund Something Short's continuing defense of the Enforcement Actions and the Blesson Action.

**K. Damages**

78. Defendants' conduct destroyed Something Good. Something Good ceased operations as a direct result of the cost and disruption of the litigation described above and of Defendants' interference with its investors and operations.

79. Defendants' conduct forced the sale of Something Short to avoid insolvency and then delayed its closing, requiring Plaintiffs to fund the company's operations and carrying costs in the interim, as alleged in Part J.

80. Plaintiffs have incurred more than $700,000 in attorneys' fees and expenses defending the Prohibited Proceeding, the Enforcement Actions, and the Blesson Action. The fees and expenses incurred in defending the Prohibited Proceeding are the direct damages of the breach of Section 8.a.

81. Ilan has suffered injury to his professional reputation as an attorney and to his standing and relationships in the legal community. Raphael has suffered severe injury to the "Chef Raph" name, brand, and likeness on which his professional livelihood depends: in the period following Defendants' accusations, Raphael's event bookings declined sharply, brand partnerships and endorsement arrangements were withdrawn or not renewed, and the commercial value of his cookbook and social-media platform was impaired; he has only recently begun to recover. Plaintiffs conservatively value Ilan's reputational injury at not less than $1,000,000 and Raphael's reputational and brand injury at not less than $2,000,000.

82. In the aggregate, and before exemplary damages, punitive damages, interest, and fees, Plaintiffs' damages are not less than $6,700,000, consisting of: not less than $1,500,000 for the destruction of Something Good; not less than $1,500,000 for the forced sale of Something Short, a going concern that Plaintiffs would otherwise have continued to own and operate; not less than $700,000 in attorneys' fees and expenses; not less than $1,000,000 for Ilan's reputational injury; not less than $2,000,000 for Raphael's reputational and brand injury; and additional sums, to be proven at trial, for the carrying costs and operating losses incurred during the delayed closing of the Something Short Sale, the diverted sale proceeds, and lost business opportunities.

## CAUSES OF ACTION

## COUNT I

## (Breach of Contract—Settlement Agreement)

## (Against Martin Borkan and MSB Hospitality, LLC)

83. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

84. The Settlement Agreement is a valid and binding contract between Plaintiffs, on the one hand, and Borkan and MSB, on the other, supported by consideration, including the $450,000 Buyout.

85. Plaintiffs performed their obligations under the Settlement Agreement.

86. Borkan and MSB accepted and have retained the full $450,000 Buyout, have never sought rescission of the Settlement Agreement or tendered its return, and have themselves repeatedly invoked and sued to enforce the Agreement. Having elected to treat the Agreement as in force and to keep its benefits, they remain bound by their own covenants under it.

87. Borkan and MSB breached the Settlement Agreement as follows:

(a) They breached Section 5 by failing to send to P&N, within three days of the Effective Date or at all, the joint letter retracting the P&N Letter and advising that all disputes between the Parties had been resolved.

(b) They breached Section 8.a by commencing and prosecuting the Prohibited Proceeding, a "legal action against the Releasees for . . . Released Claims."

(c) They breached Section 11 by making, directly and through a person acting as their agent and in concert with them, the Disparaging Statements, including Borkan's statements to Hernandez in the Borkan Call that Plaintiffs were "fraudsters" and "con artists" who "steal money from people," each of which was a statement

"intended, directly or indirectly, to disparage and/or defame" Plaintiffs; and by responding to third-party inquiries about the Dispute with accusations rather than the scripted response Section 11 requires.

(d) They breached Section 12 by disclosing the terms of the Settlement Agreement, including the amount and source of the Buy Out Payments, to the Prospective Purchasers, investors, and others, in circumstances falling within none of Section 12's three exceptions.

(e) They breached Section 22 by failing to return all copies of the Companies' files and computerized databases, by retaining access to the Companies' systems and information, by obtaining the Companies' post-settlement operating agreements and capitalization table, and by using those materials in the Enforcement Actions, the Investor Subpoenas, and the Attachment Motion.

(f) They breached Section 13 by failing to act in good faith to comply with the Agreement, including by retaining and exploiting the Companies' materials and by disparaging Plaintiffs to third parties as alleged above.

88. Each breach was material. Together, the breaches deprived Plaintiffs of the essential benefit of their bargain—finality and freedom from litigation and disparagement concerning the released matters—and were committed willfully and in bad faith.

89. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $6,700,000, including the attorneys' fees and expenses incurred in defending the Prohibited Proceeding, the destruction of Something Good, the forced sale of Something Short and the costs of its delayed closing, and reputational harm.

90. Under Section 19, Plaintiffs, as the prevailing Parties, are entitled to recover from Borkan and MSB their reasonable attorneys' fees and costs incurred in this action and in the Prohibited Proceeding.

**COUNT II**

**(Breach of the Covenant Not to Sue)**

**(Against Martin Borkan and MSB Hospitality, LLC)**

91. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

92. Section 8.a of the Settlement Agreement is an express, independent covenant: "Borkan Releasors covenant not to sue and/or initiate any legal action against the Releasees for any of the Released Claims." The Borkan Releasors are MSB and Borkan, acting for themselves and for their "directors, members, owners, investors, managers, officers, shareholders, employees, subcontractors, attorneys, successors and assigns, and insurers." The Releasees include Ilan, Raphael, Something Good, Sando, Something Short, Something Good Events LLC, and their members, owners, attorneys, and affiliates. The Released Claims include every claim "from the beginning of the world to the Effective Date, including, without limitation, any claims asserted or that could have been asserted in the Dispute or Action."

93. Section 8 preserves for MSB only an action "to enforce this Agreement." The Prohibited Proceeding was not such an action: it sought indemnification and advancement under the Operating Agreement and damages for breach of fiduciary duty, and its complaint did not mention the Settlement Agreement.

94. Plaintiffs paid the $450,000 Buyout in material part for the covenant not to sue, the purpose of which was to spare Plaintiffs the burden and expense of further litigation over the released matters.

95. Borkan and MSB breached Section 8.a by commencing and prosecuting the Prohibited Proceeding from September 11, 2024 until its dismissal on March 13, 2025. Upon information and belief, and to the extent the Borkan Defendants directed or funded it, the Blesson Action is a further breach.

96. The attorneys' fees and expenses Plaintiffs incurred in defending the Prohibited Proceeding are the direct and foreseeable damages of the breach of a covenant not to sue, and are independently recoverable under Section 19.

97. As a direct and proximate result, Plaintiffs have been damaged in an amount to be determined at trial, consisting of the fees and expenses incurred in defending the Prohibited Proceeding together with the consequential damages alleged above.

**COUNT III**

**(Misappropriation of Trade Secrets—Defend Trade Secrets Act, 18 U.S.C. § 1836)**

**(Against Martin Borkan, MSB Hospitality, LLC, Joseph I. Pardo, Esq., Pardo Law PLLC, and the Doe Defendants)**

98. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

99. The Companies owned trade secrets within the meaning of 18 U.S.C. § 1839(3), including: (a) the identities of, and contact, commitment, and communication information for, the Companies' investors; (b) non-public financial statements and financial records; (c) the non-public terms, status, and counterparties of prospective transactions, including the Something Short Sale; and (d) strategic and operational planning materials (collectively, the "**Trade Secrets**"). Plaintiffs will identify the Trade Secrets with further particularity under an appropriate protective order.

100. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain

economic value from their disclosure or use, including competitors, counterparties, and persons seeking to interfere with the Companies' investor relationships and transactions.

101. The Companies took reasonable measures to maintain the secrecy of the Trade Secrets, as alleged in Part H above, including restricting access to persons with a need to know, maintaining the information in password-protected systems, imposing confidentiality obligations on persons with access, and, upon the departure of MSB and Borkan, requiring by contract the return of all copies and the relinquishment of all access.

102. The Trade Secrets relate to products and services used in and intended for use in interstate commerce. The Companies served customers from other States, purchased goods and processed payments in interstate commerce, and solicited and maintained investors across state lines.

103. By the Assignment, Plaintiffs are the owners of the Trade Secrets and of all claims arising from their misappropriation within the meaning of 18 U.S.C. §§ 1836(b)(1) and 1839(4).

104. Defendants misappropriated the Trade Secrets within the meaning of 18 U.S.C. § 1839(5):

(a) Borkan and MSB acquired the Trade Secrets by improper means by retaining copies of the Companies' databases and records, and access to the Companies' systems, in breach of their contractual duty under Section 22 to return and disclaim them, and by soliciting and obtaining additional Trade Secrets from Blesson and, upon information and belief, from one or more other persons with access to them, each of whom disclosed them in breach of a duty to maintain their secrecy.

(b) Pardo and Pardo Law acquired the Trade Secrets from Borkan, MSB, Blesson, and, upon information and belief, other persons acting in concert with them, knowing or

having reason to know that they were acquired by improper means and derived through persons who owed a duty to maintain their secrecy. Pardo's knowledge of Section 22 is established by his representation of MSB at the time the Agreement was executed and his designation in Section 10 as the recipient of notices under it.

(c) Each of these Defendants used and disclosed the Trade Secrets without consent, including in the Enforcement Actions, in which they filed the Companies' post-settlement capitalization table and identified the Companies' investors by name and investment amount; in the Attachment Motion, which disclosed the non-public terms and status of the Something Short Sale; in the Investor Subpoenas, which were directed to investors known only from the Companies' confidential records and to which Defendants attached Ilan's confidential September 9, 2025 communication to those investors; in the Borkan Call, which was made possible by Defendants' possession of the confidential information identifying Hernandez as the purchaser; and in the communications to investors described in Parts I and J.

105. The misappropriation occurred after May 11, 2016. Plaintiffs did not discover, and could not reasonably have discovered, the misappropriation until the Companies' confidential materials began to appear in Defendants' filings and subpoenas, which occurred within three years before the commencement of this action. The misappropriation is continuing. This action is timely under 18 U.S.C. § 1836(d).

106. The misappropriation was willful and malicious. Borkan and MSB had signed the very provision requiring return and disclaimer of the materials; the Attorney Defendants knew of that provision; and the Trade Secrets were deployed for the specific purpose of disrupting the Something Short Sale and the Companies' investor relationships.

107. As a direct and proximate result, Plaintiffs have suffered actual loss, and Defendants have been unjustly enriched, in amounts to be determined at trial. Plaintiffs are entitled to damages under 18 U.S.C. § 1836(b)(3)(B); exemplary damages of up to two times the damages awarded under § 1836(b)(3)(C); reasonable attorneys' fees under § 1836(b)(3)(D); and injunctive relief under § 1836(b)(3)(A), including an order requiring the return and destruction of all misappropriated materials and an accounting of all persons to whom they were disclosed.

**COUNT IV**

**(Misappropriation of Trade Secrets and Confidential Information—New York Common Law; in the Alternative, Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq.)**

**(Against Martin Borkan, MSB Hospitality, LLC, Joseph I. Pardo, Esq., Pardo Law PLLC, and the Doe Defendants)**

108. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

109. The Trade Secrets, together with the Companies' other confidential and proprietary information described in Part H, including internal communications (collectively, the "**Confidential Information**"), were maintained in confidence by the Companies and were made available to MSB and Borkan solely by virtue of MSB's membership interests in Something Good and Something Short. Upon the relinquishment of those interests under Section 3, MSB and Borkan retained no right to possess or use the Confidential Information, and Section 22 imposed an express duty to return it and disclaim access to it.

110. Blesson owed the Companies a duty of confidence with respect to the Confidential Information arising from his position and his access to it, as alleged in Part H.

111. Borkan and MSB acquired and retained the Confidential Information in breach of their duties under Sections 12, 13, and 22, and Defendants acquired it from Blesson and, upon

information and belief, from other persons acting in concert with him, in breach of their duties of confidence. Each of these Defendants used the Confidential Information, knowing it had been obtained in breach of those duties, in the manner alleged in Parts G through J.

112. Defendants' conduct was willful and in bad faith. As a direct and proximate result, Plaintiffs suffered damages including the fees and expenses incurred in responding to the subpoenas and filings built on the Confidential Information, disruption of investor relationships, the harm to the Something Short Sale, and loss of the value of secrecy. Defendants were unjustly enriched by the litigation advantage the Confidential Information supplied. Plaintiffs are entitled to compensatory damages, disgorgement, punitive damages, and injunctive relief.

113. In the alternative, to the extent Florida law governs this claim, the same conduct constitutes misappropriation under the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.002–688.004, entitling Plaintiffs to injunctive relief, damages, exemplary damages for willful and malicious misappropriation, and attorneys' fees.

**COUNT V**

**(Tortious Interference with Prospective Economic Advantage)**

**(Against All Defendants)**

114. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

115. Plaintiffs had business relationships and prospective economic advantages with third parties, including: (a) the Something Short Sale with Hernandez and the Prospective Purchasers; and (b) relationships with Something Short's investors, including the investors who were subpoenaed as alleged above.

116. Defendants knew of these relationships. Borkan knew of the Something Short Sale and of Hernandez's role as the purchaser under the executed Asset Purchase Agreement when he

placed the Borkan Call, and the Attachment Motion filed weeks earlier quoted Ilan's September 9, 2025 report to investors on the status of the sale. MSB was a member of Something Good and Something Short, and Borkan, as MSB's principal, knew their investors, operations, and plans; and the Attorney Defendants learned of them through the representation and the litigation.

117. Defendants intentionally interfered with these relationships by direct contact with the counterparty and through wrongful means. The Borkan Call, telling the buyer that the sellers were fraudsters and thieves, that he could "get in trouble" for dealing with them, and that he should consult Borkan's attorney, was made for the purpose of inducing Hernandez to abandon or renegotiate the Something Short Sale; the Investor Subpoenas had been noticed to Something Short's investors two days earlier, on October 6, 2025, as the transaction approached closing; and the Disparaging Statements were made to those investors in the same period. The wrongful means include the Disparaging Statements, including the Borkan Call, which constitute defamation and injurious falsehood; the misappropriation of the Trade Secrets and Confidential Information; and the abuse of process alleged in Count VI. In the alternative, Defendants acted for the sole purpose of harming Plaintiffs, as Borkan's stated objectives confirm.

118. But for Defendants' interference, the Something Short Sale would have closed on schedule, and Plaintiffs would have preserved the investor relationships described above.

119. As a direct and proximate result, Plaintiffs have suffered damages including the carrying costs and operating losses caused by the delayed closing of the Something Short Sale, lost investment, and injury to the relationships described above, and are entitled to compensatory and punitive damages.

**COUNT VI**

**(Abuse of Process)**

**(Against Martin Borkan, MSB Hospitality, LLC, Joseph I. Pardo, Esq., and Pardo Law PLLC)**

120. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

121. This Count is not predicated on the commencement of litigation. It is predicated on these Defendants' use of regularly issued process, after its issuance, to achieve collateral objectives the process was not designed to serve.

122. The Investor Subpoenas, described in Part G, were noticed on October 6, 2025 under the authority of the court in the Miami-Dade Borkan Action and issued under New York Civil Practice Law and Rules § 3119 to recipients in New York. The court's docket reflects five subpoenas served on or about October 24, 2025 and a sixth served on or about November 2, 2025; upon information and belief, approximately sixteen were directed to Something Short's investors in all.

123. The Investor Subpoenas were regularly issued process. Each bore the caption of the Miami-Dade Borkan Action, invoked New York Civil Practice Law and Rules § 3119, and commanded the recipient to appear for a deposition and to produce documents.

124. Upon information and belief, the recipients were identified from the Companies' confidential investor records, including the capitalization table that Borkan and MSB admitted possessing in their October 21, 2024 complaint, and not from any public source or from discovery lawfully obtained in the Miami-Dade Borkan Action. The recipients were passive investors in a New York company. None had any role in the negotiation or performance of the Settlement Agreement, which was the subject of that action.

125. After the Investor Subpoenas issued, these Defendants used them for purposes collateral to the Miami-Dade Borkan Action and outside the legitimate ends of a subpoena. Specifically: (a) they noticed the subpoenas on October 6, 2025, two days before Borkan told the buyer that Plaintiffs were fraudsters and that he could "get in trouble" for dealing with them; (b) they directed the subpoenas to Something Short's entire investor base in the weeks between the execution of the Asset Purchase Agreement and the closing of the Something Short Sale; (c) they used the subpoenas to demand the Asset Purchase Agreement, all documents concerning it, and the investors' communications about Something Short's "business, financial health, or management," and to place Ilan's confidential September 9, 2025 investor communication before every recipient—information directed at the sale and at the investors' confidence in Plaintiffs, and useful to the Attachment Motion then pending, by which these Defendants sought to seize $100,000 of the sale proceeds or to enjoin the sale, rather than evidence of whether Plaintiffs had performed the Settlement Agreement; and (d) twelve days before moving for a default judgment that would end the action, they continued to press for investor depositions in December 2025, after any evidentiary purpose in the action had ended.

126. The collateral objectives these Defendants pursued through the Investor Subpoenas—signaling to Something Short's investors that dealing with Plaintiffs carried legal risk, deterring their continued support for the company and the sale, obtaining information about the sale for use in attaching its proceeds, and preventing or delaying the Something Short Sale—were not objectives the Miami-Dade Borkan Action could legitimately serve, and the information sought from the recipients was not sought for use as evidence of the claims pleaded in that action.

127. These Defendants acted with intent to harm Plaintiffs and without excuse or justification.

128. As a direct and proximate result, Plaintiffs have suffered special damages, including the carrying costs and operating losses incurred by reason of the delayed closing of the Something Short Sale, lost investment in Something Short, the fees and expenses incurred in responding to the Investor Subpoenas, and the time and expense of addressing their effects on the recipients, including the investor inquiries described in Part I, and are entitled to compensatory and punitive damages.

**COUNT VII**

**(Defamation Per Se; in the Alternative, Injurious Falsehood)**

**(Against Martin Borkan, MSB Hospitality, LLC, Joseph I. Pardo, Esq., and Pardo Law PLLC)**

129. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is predicated exclusively on the out-of-court Disparaging Statements identified in Part I. No statement made in a court filing or in the course of a judicial proceeding is pleaded as a defamatory publication.

130. Each of the Disparaging Statements was published to one or more third parties. The statements in the Borkan Call were published by Borkan, acting for himself and as the principal of MSB, to Hernandez on October 8, 2025. The statements to investors described in Part I were published by Blesson to investors in Something Short, acting, upon information and belief, at the request of and on behalf of Borkan, MSB, and Pardo. Borkan and MSB are liable for Blesson’s statements as the principals at whose instance and on whose behalf they were made; Pardo and Pardo Law are liable for them because, upon information and belief, Pardo procured and coordinated them, and in any event as participants in the conspiracy alleged in Count VIII.

131. Each of the Disparaging Statements was of and concerning Plaintiffs, identifying Ilan and Raphael by name or by unmistakable reference.

132. Each of the Disparaging Statements was a false statement of fact. Plaintiffs are not fraudsters or con artists and did not steal, or intend to steal, Something Short's funds or defraud its investors; the Something Short Sale was a last-resort, arm's-length transaction with an unrelated buyer to return capital to investors, not a sham or a fraudulent conveyance; and no former associate of Something Short was among the purchasers.

133. Each Defendant knew the Disparaging Statements were false or made them with reckless disregard of their truth. Borkan and MSB had signed the Agreement that authorized the sources of the Buy Out Payments; Pardo represented MSB when it was signed.

134. The Disparaging Statements are defamatory per se because they charge Plaintiffs with serious crimes—theft and fraud—and because they tend to injure Plaintiffs in their professions: Ilan as an attorney whose honesty is essential to his license and practice, and Raphael as a chef and brand whose commercial value depends on his reputation for integrity and whose bookings, partnerships, and endorsements fell away after the accusations circulated. Damages are presumed.

135. This Count is asserted as to Disparaging Statements published within one year before the commencement of this action.

136. In the alternative, to the extent any Disparaging Statement disparaged Plaintiffs' businesses, property, or transactions rather than Plaintiffs personally, Defendants are liable for injurious falsehood: the statements were false; they were published to third parties with malice and with knowledge of their falsity; they played a material and substantial part in delaying the closing of the Something Short Sale and in inducing investors to withhold or withdraw their support; and

Plaintiffs suffered special damages consisting of the operating costs of Something Short during the delayed closing and the loss of investor commitments, in amounts to be proven at trial.

137. Plaintiffs are entitled to presumed, compensatory, special, and punitive damages, including, for Raphael, damages for the injury to the "Chef Raph" name, brand, and likeness described in Part K.

**COUNT VIII**

**(Civil Conspiracy and Aiding and Abetting)**

**(Against All Defendants)**

138. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is asserted to impose joint and several liability for the torts alleged in Counts III through VII; it does not stand alone.

139. Upon information and belief, Borkan and MSB agreed, no later than the Effective Date, to take the benefit of the Settlement Agreement while continuing to pursue Plaintiffs through litigation, disparagement, and interference. The Attorney Defendants joined that agreement no later than the commencement of the Prohibited Proceeding on September 11, 2024, and Blesson, who is not named as a defendant here, joined it no later than the autumn of 2024.

140. In furtherance of the agreement, Defendants committed the overt acts alleged above, including: the retention of the Companies' materials in breach of Section 22; the recruitment of Blesson and the acquisition of the Confidential Information from him and, upon information and belief, from others; the commencement and prosecution of the Prohibited Proceeding; the acquisition and use of the Companies' post-settlement records; the Investor Subpoenas and their transmission to Something Short's investors as the sale approached; the

Attachment Motion; the Borkan Call; and the Disparaging Statements made to investors by Blesson in concert with Defendants.

141. Each Defendant knew of the tortious character of the conduct and provided substantial assistance to it: Borkan and MSB supplied the objective, the financing, and the retained materials; and the Attorney Defendants supplied the proceedings, the subpoenas, and, upon information and belief, the coordination of Blesson's statements to investors.

142. Defendants are jointly and severally liable for all damages caused by the torts committed in furtherance of the conspiracy. Their conduct was willful and malicious and warrants punitive damages.

**COUNT IX**

**(Declaratory Judgment, 28 U.S.C. §§ 2201–2202)**

**(Against Martin Borkan and MSB Hospitality, LLC)**

143. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

144. An actual and justiciable controversy exists between Plaintiffs and the Borkan Defendants concerning the scope of the releases and covenant not to sue in Sections 8 and 8.a of the Settlement Agreement and the Borkan Defendants' continuing obligations under Sections 5, 11, 12, and 22. The Borkan Defendants have asserted claims under the Operating Agreement notwithstanding Sections 3 and 8, have never sent the retraction letter Section 5 requires, have retained and used the Companies' materials notwithstanding Section 22, and have made statements about Plaintiffs to third parties notwithstanding Sections 11 and 12. The controversy is definite, concrete, and ongoing. Plaintiffs do not seek by this Count any declaration concerning the matters adjudicated in the Enforcement Actions.

145. Plaintiffs seek a declaration that:

(a) the releases in Section 8 and the covenant not to sue in Section 8.a extend to any claim by MSB or Borkan to rights, benefits, indemnification, or advancement under the Operating Agreement or by reason of MSB's former membership in Something Good, and bind MSB, Borkan, and the other Borkan Releasors, including their attorneys, successors, and assigns;

(b) the Prohibited Proceeding asserted Released Claims in violation of Section 8.a; and

(c) MSB and Borkan remain bound by Sections 5, 8.a, 11, 12, and 22, including the obligations to send the retraction letter Section 5 requires, to return all copies of the Companies' materials, and to refrain from any access to or use of them.

146. These declarations concern ongoing and prospective conduct that an award of damages for past breaches cannot fully remedy. Plaintiffs do not seek by this Count to enjoin or interfere with any pending state-court proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award:

(a) on Counts I through VIII, compensatory and consequential damages in an amount to be determined at trial but not less than $6,700,000, including the attorneys' fees and expenses incurred in defending the Prohibited Proceeding;

(b) on Count III, exemplary damages of up to two times the damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C);

(c) on Counts IV through VIII, punitive damages in an amount sufficient to punish and deter;

(d) on Count IX, the declarations set forth therein;

(e) permanent injunctive relief, to the extent permitted by 28 U.S.C. § 2283 and without enjoining any pending state-court proceeding, prohibiting Defendants and all persons acting in concert with them from commencing any new proceeding against the Releasees on Released Claims, from using or disseminating the Trade Secrets and Confidential Information, and from making statements to third parties concerning Plaintiffs beyond those Sections 11 and 12 permit, and directing MSB and Borkan to perform Section 5 of the Settlement Agreement by sending the retraction letter it requires;

(f) on Count III, an order under 18 U.S.C. § 1836(b)(3)(A) requiring the return of all misappropriated materials and the destruction of all copies, with certification under oath, and an accounting of all persons to whom they were disclosed;

(g) reasonable attorneys' fees and costs against Borkan and MSB under Section 19 of the Settlement Agreement, and against the Defendants named in Count III under 18 U.S.C. § 1836(b)(3)(D);

(h) prejudgment and post-judgment interest at the applicable rates, and the costs of this action; and

(i) such other and further relief as the Court deems just and proper.

The remedies requested above are cumulative and, where inconsistent, are pleaded in the alternative.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable. Plaintiffs acknowledge that Section 18 of the Settlement Agreement provides that the Parties "waive any right to trial by jury, which either may have in any action to interpret, apply or enforce

this Agreement, or in which this Agreement is asserted as a defense," and make this demand without prejudice to that provision as to the Counts and Defendants to which it applies.

Dated: New York, New York
October 8, 2026

Respectfully submitted,

**JASPER C.B. WONG, ESQ.**
Attorney at Law

By: /s/ Jasper C.B. Wong
Jasper C.B. Wong, Esq.
307 W 38th Street, 16th Floor
New York, New York 10018
(951) 376-7277
jaspercbwong@gmail.com

*Attorney for Plaintiffs Ilan Khutorsky and Raphael Khutorsky*